UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN STANLEY,<br><br>Plaintiff,<br><br>-against-<br><br>JOSEPH F. "CHIP" SKOWRON III,<br><br>Defendant. | Civil Action No. 12 cv 8016 (SAS)<br>ECF CASE<br><br>**ORAL ARGUMENT**<br>**REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
## PARTIAL DISMISSAL OF THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

SORINRAND LLP
Joshua H. Epstein
515 Madison Avenue, 13th Floor
New York, New York 10022
(212) 600-2085

*Attorneys for Defendant*
*Joseph F. Skowron III*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................................1

THE RELEVANT ALLEGATIONS OF THE COMPLAINT.......................................................3

    The Criminal Charges Against Skowron ..................................................................................4

    Morgan Stanley Had Ample Reason To Suspect That Skowron Had
    Engaged In Insider Trading .....................................................................................................6

    The SEC Complaint.................................................................................................................9

    The SEC Settlement.................................................................................................................9

    Morgan Stanley Seeks Restitution Under The MVRA..........................................................10

    The Restitution Decision........................................................................................................10

    The Complaint .......................................................................................................................10

ARGUMENT.................................................................................................................................11

    I.     The Relevant Standard .............................................................................................11

    II.    Morgan Stanley's Contribution Claim Fails As A Matter Of Law...........................12

    III.   The Breach Of Fiduciary Duty Claim Should Be Dismissed To The
           Extent It Seeks Damages For Morgan Stanley's Disgorgement
           Payment To The SEC.................................................................................................15

    IV.   Morgan Stanley Has Failed To Adequately Allege Reasonable Reliance And Its
           Fraud Claim Therefore Fails As A Matter Of Law....................................................18

CONCLUSION..............................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*484 Assocs., L.P. v. Moy*,
    No. 06 Civ. 2290 (PAC), 2007 WL 683999 (S.D.N.Y. March 5, 2007) .............. 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................ 11, 19

*Ashland, Inc. v. Morgan Stanley & Co., Inc.*,
    652 F.3d 333 (2d Cir. 2011)................................................................................. 18

*Aviamax Aviation Ltd. v. Bombadier Aerospace Corp.*,
    No. 3:08-cv-1958 (CFD), 2010 WL 1882316 (D. Conn. May 10, 2010)............. 19, 20

*Belin v. Weissler*,
    No. 97 Civ. 8787 (RWS), 1998 WL 391114 (S.D.N.Y. July 14, 1998) ............... 20, 21, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................ 11

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)................................................................................. 3

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)................................................................................. 19, 21

*Ferring B.V. v. Allergan, Inc.*,
    No. 12 Civ. 2650, 2013 WL 1144878 (S.D.N.Y. Mar. 19, 2013) ........................ 16

*Fromer v. Yogel*,
    50 F. Supp.2d 227 (S.D.N.Y. 1999)..................................................................... 13

*Giannacopoulos v. Credit Suisse*,
    37 F. Supp.2d 626 (S.D.N.Y. 1999)..................................................................... 23

*Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*,
    No. 11 Civ. 594 (DAB), 2012 WL 2953055 (S.D.N.Y. July 16, 2012) ............... 15, 16

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................. 11

*In re Leslie Fay Cos. Secs. Litig.*,
    918 F. Supp. 749 (S.D.N.Y. 1996) ...................................................................... 13

*Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004)...................................................................................15

*Johnson v. Nextel Communications, Inc.*,
660 F.3d 131 (2d Cir. 2011)...................................................................................16

*KBL Corp. v. Arnouts*,
646 F. Supp.2d 335 (S.D.N.Y. 2009).....................................................................14

*Keywell Corp. v. Weinstein*,
33 F.3d 159 (2d Cir. 1994).....................................................................................21

*Kopperl v. Bain*,
3:09-cv-1754 (CSH), 2010 WL 3490980 (D. Conn. Aug. 30, 2010) ..................15, 16

*LNC Inv., Inc. v. First Fidelity Bank. Nat. Ass'n*,
935 F. Supp. 1333 (S.D.N.Y. 1996).......................................................................14

*Musick, Peeler & Garrett v. Employers Ins. of Wausau*,
508 U.S. 286 (1993)...............................................................................................13

*Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*,
451 U.S. 77 (1981).................................................................................................14

*Pension Comm. of the University of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp.2d 163 (S.D.N.Y. 2006).....................................................................15

*Picard v. JPMorgan Chase & Co.*,
460 B.R. 84 (S.D.N.Y. 2011).................................................................................14

*Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*,
No 3:12CV220 (WWE), 2012 WL 5835392 (D. Conn. Nov. 16, 2012)..............16

*SEC v. Commonwealth Chemical Sec., Inc.*,
574 F.2d 90 (2d Cir. 1978).....................................................................................18

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996).................................................................................18

*SEC v. Manor Nursing Ctrs, Inc.*,
458 F.2d 1082 (2d Cir. 1972).................................................................................18

*Steed Finance LDC v. Laser Advisers, Inc.*,
258 F. Supp.2d 272 (S.D.N.Y. 2003).....................................................................13

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
    740 F. Supp.2d 441 (S.D.N.Y. 2010)...................................................................*passim*

*Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*,
    351 Fed. Appx. 472 (2d Cir. 2009) ...................................................................... 16

*United States v. Skowron*,
    839 F. Supp. 2d 740 (S.D.N.Y. 2012).................................................................4, 17, 18

Defendant Joseph F. Skowron III ("Skowron") respectfully submits this memorandum of law and the accompanying Declaration of Joshua H. Epstein, dated May 3, 2013 (cited as "Epstein Dec. ¶ __"), in support of his motion to dismiss Counts Three and Five, and a portion of Count Two of the Complaint (cited as "Compl. ¶ __"), pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff Morgan Stanley ("Morgan Stanley") blames defendant Skowron, a former Morgan Stanley managing director, for enormous losses the bank claims to have suffered in 2010 and 2011. Skowron managed hedge funds owned by Morgan Stanley. In 2007 and 2008, he traded on illegally-obtained inside information. The illegal trades allowed Morgan Stanley to avoid a $30 million loss. In 2011, Morgan Stanley disgorged the $30 million in ill-gotten gains to the SEC. Later that year, after pleading guilty to insider trading and obstruction of justice before the Honorable Denise L. Cote, Skowron received a five year prison sentence, forfeited over $7 million to the Department of Justice and the SEC, and was ordered to pay over $5 million in criminal restitution to injured trading counterparties.

Morgan Stanley also sought restitution from Skowron. It asked Judge Cote for $44 million, a sum which included, and reflected Morgan Stanley's determination to claw back, its disgorged ill-gotten gains. While awarding restitution to Morgan Stanley based on Skowron's compensation and Morgan Stanley's legal fees (a decision that is the subject of Skowron's pending appeal to the Second Circuit), Judge Cote denied Morgan Stanley's attempt to recover its illegal trading gains for the obvious, common sense reason that "[t]his was not money [Morgan Stanley] was legally entitled to retain."

Undaunted (and unashamed) by its failed attempt to recoup illegal gains, Morgan Stanley came to this Court to try again. Its Complaint in this action alleges two claims which seek recovery of the money it disgorged to the SEC. Both should be dismissed. The first, for contribution, fails because while only joint tortfeasors can seek contribution under the federal securities laws, Morgan Stanley insists that it did nothing wrong. The second, part of Morgan Stanley's claim for breach of fiduciary duty, cannot survive because while any such claim requires that a plaintiff suffer damages, Morgan Stanley was not damaged by disgorging funds it was not legally entitled to retain.

Morgan Stanley also asserts a fraud claim, alleging that it was "defrauded" by Skowron's denials of wrongdoing for "nearly three years". But Morgan Stanley seems to have overlooked the fact that its own Complaint reveals that it could not have reasonably relied on Skowron's protestations of innocence alone when: (i) it knew that the facts surrounding the trades at issue were highly suspicious; (ii) it was aware of Skowron's strong motive to engage in the illegal trades; and (iii) even a cursory investigation would have revealed that Skowron had a personal relationship with one of the few people with access to the inside information, and was engaged in constant communication with that person before, during and after the execution of the trades.

Morgan Stanley clearly has the means, and the motivation, to pursue Skowron on multiple fronts. But neither its size nor its punitive intent gives it the right to assert meritless claims. Accordingly, and for the reasons set forth below, Morgan Stanley's claims for contribution, breach of fiduciary duty (to the extent the claim seeks recovery of the funds Morgan Stanley disgorged to the SEC), and fraud should be dismissed.

**THE RELEVANT ALLEGATIONS OF THE COMPLAINT**

Morgan Stanley "is a global financial services firm that provides, through its subsidiaries and affiliates, products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals." Its principal place of business is in New York City. Compl. ¶ 4.

Skowron is a Connecticut resident and a former Morgan Stanley managing director. At Morgan Stanley, Skowron served as co-portfolio manager of healthcare-related hedge funds operated by FrontPoint Partners LLC ("FrontPoint"). *Id.* ¶ 8. FrontPoint was based in Greenwich, Connecticut. *See* Epstein Dec., Ex. 1, Ex. A (Amended Complaint in *SEC v. Skowron*, 10-CV-8266 (DAB) (S.D.N.Y.) (the "SEC Complaint") (cited as "SEC Compl.")),[1] ¶20.[2] Morgan Stanley owned FrontPoint, having acquired it in 2006, when it was "one of the most well-known and highly regarded hedge funds in the world," for $404 million. Compl. ¶¶ 5-6. As a Morgan Stanley managing director, "[a] significant portion of Skowron's annual compensation was dependent upon the performance of the funds he co-managed." *Id.* ¶ 15. "Given the structure of his compensation, Skowron had a significant financial interest in maximizing the performance and minimizing the losses of the funds he co-managed." *Id.* ¶ 17.

---

[1] The Complaint and the SEC Complaint are collectively referred to as the "Complaints."

[2] The Complaint attaches the SEC Complaint as an exhibit, and all of the allegations in the SEC Complaint are "incorporated by reference in and expressly made part of th[e] Complaint." Compl. ¶ 82. Accordingly, the Court may consider all of the allegations in the SEC Complaint in determining the instant motion to dismiss. *See, e.g., DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110 (2d Cir. 2010) ("[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint").

**The Criminal Charges Against Skowron**

On April 13, 2011, Skowron was charged by criminal complaint with, among other things, conspiring to violate the securities laws and conspiring to obstruct justice. *United States v. Skowron*, 839 F. Supp. 2d 740, 743 (S.D.N.Y. 2012). The criminal action against him was assigned to Judge Cote. Compl. ¶ 8. On August 15, 2011, Skowron pleaded guilty to "engaging in a conspiracy to commit insider trading and obstruction of justice." *Id.* ¶ 8.

The criminal charges against Skowron stemmed from the fact that, "[o]ver a six week period in December 2007 and January 2008," Skowron caused FrontPoint to sell "approximately 6 million shares of Human Genome Sciences, Inc. ('HGSI') common stock . . . while in possession of material negative non-public information concerning HGSI's clinical trial for the drug Albumin Interferon Alfa 2-a ('Albuferon')." SEC Compl. ¶ 1.

Skowron obtained the inside information from Dr. Yves Benhamou ("Benhamou"). "Benhamou was one of five members of a Steering Committee overseeing the clinical trial." *Id.* ¶ 2. Benhamou was therefore "privy to significant confidential information regarding the progress and status of the Albuferon clinical trials." Compl. ¶ 19. Benhamou was a consultant for an "expert networking firm" that had been hired by FrontPoint. *Id.* ¶¶ 20-21, SEC Compl. ¶ 2.

Benhamou "learned material non-public information about Phase 3 of the Albuferon trial that had negative implications for Albuferon's future commercial potential." SEC Compl. ¶ 3. Benhamou "communicated such information to Skowron for Benhamou's own benefit, including: (i) the receipt of financial benefits such as payments of cash and other expenses, (ii) friendship with Skowron, and (iii) the development of a potential future business relationship." *Id.* "[I]mmediately upon receiving material non-public information from Benhamou about the

4

Albuferon trial, Skowron took action to sell the hedge funds' holdings of HGSI common stock. *Id.* ¶ 4. On key dates prior to HGSI's announcement of negative news concerning the trial, including minutes before the close of the markets on January 22, 2008, Skowron caused [FrontPoint] to sell all of [its] remaining holdings of HGSI common stock." *Id.*

"On January 23, 2008, HGSI publicly announced that all patients who had been administered the higher dosage level of Albuferon in its clinical trial would be moved to the lower dosage due to a safety issue detected during Phase 3 of the trial" (the "Announcement"). *Id.* ¶ 5. In response to the Announcement, "the market price of HGSI's common stock fell by approximately 44 percent, to $5.62 a share by the close of the markets that day." *Id.* In the six weeks leading up to the Announcement, FrontPoint sold "approximately 6 million shares of HGSI common stock – representing all of [its] holdings – thereby avoiding at least $30 million in losses." *Id.* ¶ 6.

Shortly after the Announcement, "the SEC began an investigation of FrontPoint's January 22[nd] sale of HGSI stock." Compl. ¶ 45. Morgan Stanley alleges that from the beginning of that investigation "until at least the time of his termination by Morgan Stanley in December 2010", Skowron "adamantly, repeatedly and falsely represented to Morgan Stanley and its lawyers that he had done nothing criminally wrong or otherwise improper with respect to HGSI." *Id.* ¶ 51. According to Morgan Stanley, this "proved to be very effective," as this enabled Skowron "to conceal from Morgan Stanley that he engaged in the criminal conduct to which he pleaded guilty for nearly three years." *Id.* ¶ 64.

**Morgan Stanley Had Ample Reason To Suspect**
**That Skowron Had Engaged In Insider Trading**

Despite Skowron's denials of wrongdoing, the following facts available to Morgan Stanley in February 2008 indicated that there was a strong likelihood that Skowron caused FrontPoint to sell out of its HGSI position based on illegally obtained inside information:

- Starting in February 2007, FrontPoint accumulated a very large position in HGSI over the course of ten months. By "December 3, 2007, FrontPoint held approximately $65 million in HGSI common stock." Compl. ¶ 25; SEC Compl. ¶ 27. Prior to that time, Skowron and his co-managers believed that "HGSI's stock price was undervalued and did not fully reflect the competitive opportunities presented by Albuferon." SEC Compl. ¶ 28.

- "Between December 7 and 18, 2007, the FrontPoint Healthcare Funds sold approximately 2.8 million shares, or 46 percent, of their HGSI holdings . . . ." *Id*. ¶ 53.

- On January 17, 2008, only five days before the Announcement, Skowron "instructed a FrontPoint trader to sell all of the HGSI stock held by FrontPoint." Compl. ¶ 28. Skowron "accelerated" that sale process on January 22, 2008, "causing the funds to make a large sale" – and completely exit their previously large HGSI position – on that same day. *Id*. ¶ 39; SEC Compl. ¶ 75.

- "The FrontPoint Healthcare Funds' sale of HGSI shares on January 22 comprised 47 percent of the total trading volume in HGSI shares that day." SEC Compl. ¶ 76.

- Despite FrontPoint's quick exit from its HGSI position, it "made little profit on [its] sales of HGSI common stock between December 7, 2007 and January 22, 2008 and certain of the funds realized losses on the transactions." *Id*. ¶ 77.

- Reflecting Skowron's confidence that the bad news was out of the way, as soon as HGSI's share price dropped after the January 23 Announcement, "Skowron caused the

6

FrontPoint Healthcare Funds to purchase, in a single day, more than 2.2 million shares of HGSI common stock" which he then directed the sale of a day later, for a quick profit. *Id*. ¶¶ 82-83.

- Skowron and Benhamou were close enough that when counsel for FrontPoint and Morgan Stanley wanted to interview him in connection with the recently initiated SEC investigation, Skowron – not the expert network's staff – "connected Benhamou and counsel for FrontPoint and Morgan Stanley on conference call that lasted more than twenty minutes." Compl. ¶ 55.

- In September 2007, Skowron personally paid a $5,000 hotel bill for Benhamou and his wife (for a four night stay at the Mandarin Oriental in New York) "and later expensed the cost, thereby passing the expense on to five of the FrontPoint Healthcare funds." SEC Compl. ¶ 34.

- Two months later, "Skowron treated Benhamou to dinner and wine at Blue Ginger in Wellesley, Massachusetts." Shortly thereafter, "Skowron submitted the receipt from his dinner with Benhamou for reimbursement from FrontPoint." *Id*. ¶ 36.

- "Between January 8 and January 18, Skowron and Benhamou exchanged numerous emails. Skowron told Benhamou that he was 'desperately trying to find time to get over to Paris' . . . so he could have dinner with Benhamou. He also invited Benhamou to his home where, according to his email 'the wine sits and waits for us in my cellar!'" *Id*. ¶ 58.

- On January 22, 2008, the day before the Announcement, Skowron emailed Benhamou to tell him that Skowron would arrange and pay for a car service to pick Benhamou's

daughter up at a New York airport and "told Benhamou, 'Don't hesitate to let me know if you need anything.'" *Id*. ¶ 74.

Morgan Stanley also had access to telephone, email and instant messaging records linking Skowron's communications with Benhamou to his increasingly aggressive efforts to cause FrontPoint to sell out of its HGSI position before the Announcement. Thus:

- "Telephone records reflect" Benhamou called Skowron on December 10, 2007 "starting at 2 p.m. EST." Immediately thereafter, Skowron called his co-portfolio manager and told him "to place an order to sell half of the FrontPoint Healthcare Funds' holdings of HGSI common stock." The co-portfolio manager "placed the order with FrontPoint's trader while he was still on the phone with Skowron." SEC Compl. ¶¶ 49-50.

- Instant messages between Skowron and his FrontPoint colleagues the day before the Announcement: (i) "referenced non-public information about the Achieve Trial" (*Id.* ¶ 51); and (ii) revealed Skowron celebrating FrontPoint's exit from its HGSI position while referencing a "market meltdown" that would occur the following day. *Id.* ¶ 77.

- "On the morning of January 17, 2008, less than four hours before" the data monitoring committee for the Achieve trial (a group that included Benhamou) was to meet, "Skowron emailed Benhamou and asked, 'Want to touch base today?'" *Id*. ¶ 59.

- On January 22, 2008, the day before the Announcement, "Skowron emailed Benhamou and asked 'are you around for a quick call today. Love to catch up.'" *Id*. ¶ 71.

- That same day, while on the phone with Benhamou, Skowron engaged in an instant message exchange with FrontPoint's trader in which he directed the trader to engage in a highly "aggressive" effort to sell FrontPoint's remaining holdings of HGSI stock one day before the Announcement. *Id.* ¶ 73.

8

**The SEC Complaint**

In April 2011, the SEC filed the SEC Complaint against Skowron, the FrontPoint healthcare funds that engaged in the illegal sales of HGSI stock, and Benhamou. Compl. ¶ 82. The SEC Complaint named Skowron and Dr. Benhamou as defendants and the FrontPoint healthcare funds as relief defendants. SEC Compl. ¶¶ 10-15. With respect to the FrontPoint healthcare funds, the SEC sought a judgment "ordering the Relief Defendants, as constructive trustees of illegally-obtained funds resulting from Defendants' above-described conduct, to return those funds as to which they have no legitimate claim, with prejudgment interest." *Id.* at 34.

**The SEC Settlement**

On or around April 13, 2011 – the same day the SEC Complaint was filed and well before Skowron's guilty plea – the SEC reached a settlement with the FrontPoint healthcare funds that engaged in the illegal sales of HGSI stock. Compl. ¶¶ 84-86. Pursuant to that settlement, the FrontPoint healthcare funds agreed to disgorge $29,017,156, plus prejudgment interest thereon in the amount of $4,003,669, for a total sum of $33,020,825 (the "Settlement Amount"). By order dated November 16, 2011, the Honorable Deborah A. Batts approved the SEC's settlement with the FrontPoint healthcare funds. *Id.* Morgan Stanley alleges that it was contractually "obligated to indemnify FrointPoint" for the Settlement Amount. Compl. ¶¶ 87-88.

At the time of his guilty plea in August 2011, Skowron simultaneously reached a settlement with the SEC that provides for various forms of relief against him. Epstein Dec., Ex. 1, Ex. B. By order dated November 16, 2011, Judge Batts approved the settlement between the SEC and Skowron. Epstein Dec., Ex. 1, Ex. B.

9

**Morgan Stanley Seeks Restitution Under The MVRA**

On November 18, 2011, Judge Cote sentenced Skowron to a term of five years' imprisonment, and entered a consent order of forfeiture obligating Skowron to forfeit $5 million in cash to the government. Additionally, Skowron agreed to pay the SEC a civil penalty of $2.7 million.

At Skowron's sentencing, the court directed that any additional claims for restitution be filed by December 14, 2011. In its letter dated December 14, 2011, Morgan Stanley sought a total of $44,873,878 in restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, which included the Settlement Amount. Compl. ¶ 95.

**The Restitution Decision**

In an Opinion and Order dated March 20, 2012, Judge Cote: (i) denied Morgan Stanley's request for restitution of the Settlement Amount; and (ii) granted Morgan Stanley's request for restitution for legal fees and for a portion of Skowron's compensation (the "Restitution Decision"). *Id.* ¶ 96. Skowron appealed the Restitution Decision. *Id.* ¶ 98. The appeal is pending before the Second Circuit. *Id.* ¶ 99.

On June 5, 2012, the court entered an Order staying the requirement for immediate payment of the restitution award to Morgan Stanley pending the outcome of Skowron's appeal. Compl. ¶¶ 98-99.

**The Complaint**

On October 31, 2012, Morgan Stanley filed the Complaint. The Complaint asserts claims against Skowron for: (i) "faithless servant doctrine" (Count One); (ii) breach of fiduciary duty (Count Two); (iii) fraud (Count Three); (iv) breach of contract (Count Four); and (v) contribution

(Count Five). Compl. ¶¶ 100-42. The Complaint seeks over \$65 million in damages. *Id.* ¶¶ 108, 114, 128, 142.

## ARGUMENT

### I

### THE RELEVANT STANDARD

While a court considering a motion to dismiss under Rule 12(b)(6) must assume all facts alleged in the complaint to be true, and draw all reasonable inferences in favor of the plaintiff, simply repeating the elements of a cause of action, "supported by mere conclusory statements, do[es] not suffice . . . [w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 662 (2009). To avoid dismissal, the complaint must contain "enough facts to state a claim to relief that is plausible on its face [and] nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations and internal quotation marks omitted). This means that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In addition, a complaint must allege the existence of each and every element of a cause of action. "[I]f a plaintiff does not plead all of the essential elements of his or her legal claim, a district court is required to dismiss the complaint pursuant to Rule 12(b)(6)." *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 572 (S.D.N.Y. 2011).

As set forth below, Morgan Stanley's claim for contribution (Count Five), part of its claim for breach of fiduciary duty (Count Two), and its claim for fraud (Count Three) should be dismissed because:

1. The contribution claim is doomed by Morgan Stanley's failure to allege that it knowingly participated in Skowron's violations of the federal securities laws.

2. Morgan Stanley may not seek to recover the Settlement Amount as damages for breach of fiduciary duty because it never had the legal right to retain the fruits of Skowron's insider trading and was not "damaged" by disgorging those funds to the SEC.

3. The fraud claim fails because Morgan Stanley's reliance on Skowron's denials of wrongdoing was not reasonable.

## II

## MORGAN STANLEY'S CONTRIBUTION CLAIM FAILS AS A MATTER OF LAW

In Count Five of its Complaint, Morgan Stanley claims that it "is entitled to recover from Skowron in contribution, pursuant to Section 10(b) of the Exchange Act, Rule 10b-5 and common law contribution principles, the full $33,020,825 Morgan Stanley paid in settlement of the SEC Action and the full $53,020 it paid in settlement of the Class Action."[3] Compl. ¶ 142.

Morgan Stanley is wrong. Its contribution claim fails on its face, and should be dismissed because: (i) while contribution under the federal securities laws is available only to joint tortfeasors, the Complaint insists that "Morgan Stanley was not in any manner responsible

---

[3] Morgan Stanley contends that it paid $53,020 to settle a "Class Action" that was brought against FrontPoint, Skowron and Benhamou arising "out of the criminal conduct to which Skowron pleaded guilty." Compl. ¶ 90. Morgan Stanley's claim for contribution for the Class Action settlement payment fails for the same reasons as its claim for contribution to recover the Settlement Amount.

12

for the conduct that that led to the payment of the Settlement Amount or the settlement in the Class Action," (*see* Compl. ¶ 141) and (ii) there is no "common law" right to contribution where, as here, the underlying liability was created by federal statute.

First, as this Court has held, "contribution for a § 10(b) violation is allowed only among 'joint tortfeasors'." *Fromer v. Yogel*, 50 F. Supp.2d 227, 234 (S.D.N.Y. 1999) (Scheindlin, J.) (quoting *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 292 (1993)). To survive a motion to dismiss, a party seeking contribution under the federal securities laws must therefore allege that it was a joint tortfeasor with the defendant. This is precisely the opposite of what Morgan Stanley alleges here.

*Fromer* made it clear that a failure to plead that the plaintiff and defendant are joint tortfeasors is fatal to a contribution claim based on the securities laws:

> Here, the problem is that there is nothing in the Complaint that can be read as an allegation or concession of fraudulent conduct by the Plaintiffs ... [t]hese allegations will not support a claim for contribution. Under the federal securities laws, such a claim must be based on allegations that all the parties violated securities laws, not based on allegations that the Defendants defrauded Plaintiffs.

*Id.* at 235.

This Court dismissed the *Fromer* plaintiffs' contribution claim because they "failed to plead that they 'knowingly participated' in any fraud jointly with Defendants [they therefore] failed to state a viable claim for contribution." *Id.* at 237; *see also Steed Finance LDC v. Laser Advisers, Inc.*, 258 F. Supp.2d 272, 281 (S.D.N.Y. 2003) ("It is clear that claims for contribution under the Federal securities laws are permitted only among 'joint tortfeasors'."); *In re Leslie Fay Cos. Secs. Litig.*, 918 F. Supp. 749, 756 (S.D.N.Y. 1996) (same).

*Fromer* is on all fours with this case. Morgan Stanley has asserted a contribution claim based on the federal securities laws. Like the *Fromer* plaintiffs, Morgan Stanley has neither alleged nor conceded that it engaged in any fraudulent conduct. Instead, it insists that it: (i)

"engaged in no wrongdoing, did not act with negligence or recklessness, and did not knowingly and willfully violate the federal securities laws," and (ii) "was not in any manner responsible for the conduct that that led to the payment of the Settlement Amount or the settlement in the Class Action." Compl. ¶¶ 134, 141. Morgan Stanley's contribution claim therefore fails as a matter of law.

Second, to the extent Morgan Stanley is asserting a right to contribution under state law (its Complaint alleges an "entitle[ment] to recover from Skowron in contribution pursuant to . . . common law contribution principles"), its claim fails as a matter of law. Compl. ¶ 142.

It is well established that "'[t]he source of a right of contribution under state law must be must be an obligation imposed by state law.'" *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 99 (S.D.N.Y. 2011) (McMahon, J.) (quoting *LNC Inv., Inc. v. First Fidelity Bank. Nat. Ass'n*, 935 F. Supp. 1333, 1349 (S.D.N.Y. 1996)).

As Judge McMahon held in *Picard*, "where the liability that is the basis for the contribution claim is 'entirely a creature of federal statute,' the [party seeking contribution] must rely on federal, not state, contribution law." *Id.* (quoting *Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97-98, (1981)); *see also KBL Corp. v. Arnouts*, 646 F. Supp.2d 335, 341 (S.D.N.Y. 2009) (a "plaintiff cannot use New York State common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme").

Here, Morgan Stanley's contribution claim is based entirely on what the Complaint describes as "the conduct that led to the payment of the Settlement Amount," namely Skowron's violations of the federal securities laws. *See* Compl. ¶¶ 135-36, 138. As a result, Morgan

14

Stanley cannot seek contribution based on state law, and its contribution claim must be dismissed

for that reason as well.

## III

## THE BREACH OF FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED TO THE EXTENT IT SEEKS DAMAGES FOR MORGAN STANLEY'S DISGORGEMENT PAYMENT TO THE SEC

Count Two of the Complaint sets forth a claim for breach of fiduciary duty, and alleges

that "[a]s a result of Skowron's breaches of fiduciary duty . . . Morgan Stanley's damages

include . . . the $33,020,825 Morgan Stanley paid in settlement to the SEC." Compl. ¶ 114.[4]

As set forth below, the breach of fiduciary duty claim should be dismissed to the extent it

seeks recovery of the Settlement Amount, because: (i) damages are a required element of

Morgan Stanley's breach of fiduciary duty claim; and (ii) Morgan Stanley's disgorgement of the

Settlement Amount to the SEC did not cause it to suffer any legally cognizable harm.[5]

---

[4] As this Court has held, in diversity actions like this one, "federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law. Under New York choice-of-law rules, the first step of the analysis is to determine whether there is a substantive conflict between the laws of the relevant choices. 'In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'" *Pension Comm. of the University of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp.2d 163, 191 (S.D.N.Y. 2006) (Scheindlin, J.) (quoting *Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004)). Here, given that Skowron lived in Connecticut (Compl. ¶ 8), FrontPoint was headquartered in Connecticut (SEC Compl. ¶ 20), Morgan Stanley is headquartered in New York (Compl. ¶ 2), and the Complaint alleges that some of the relevant events took place in New York (Compl. ¶¶ 23, 36, 101), the "relevant choices" are New York and Connecticut law. As set forth below, however, there is no substantive difference in New York and Connecticut law as to: (i) the necessity of pleading cognizable damages in support of a breach of fiduciary duty claim; and (ii) the requirement that a fraud plaintiff's reliance on the defendant's misstatements or omissions be reasonable.

[5] To the extent that Morgan Stanley's fraud claim also seeks recovery of the Settlement Amount (something which is not clear from the manner in which Morgan Stanley pled its fraud claim), that portion of the fraud claim should also be dismissed, as damages are a required element of any fraud claim under New York and Connecticut law. *Kopperl v. Bain*, 3:09-cv-1754 (CSH),

It is clear that a plaintiff must plead that it has suffered damages in order to state a legally sufficient claim for breach of fiduciary duty under New York or Connecticut law.[6] When a plaintiff fails to plead that it had been damaged in a legally cognizable manner, courts do not hesitate to dismiss the claim at issue. In *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 Fed. Appx. 472 (2d Cir. 2009), the Second Circuit affirmed Judge Daniels' grant of the defendant law firm's motion to dismiss a breach of fiduciary duty claim where the plaintiff had not adequately pled that he had suffered damages as a result of Paul, Weiss's actions. *Id*. at 474; *see also Ferring B.V. v. Allergan, Inc.*, No. 12 Civ. 2650, 2013 WL 1144878 (S.D.N.Y. Mar. 19, 2013) (Sweet, J.) (dismissing breach of fiduciary duty claim where plaintiff had not adequately pled damages); *Kopperl*, 2010 WL 3490980, at *8 (dismissing breach of fiduciary duty claim where defendant failed to allege damages in his counterclaim).

Here, Morgan Stanley cannot possibly claim it was damaged by disgorgement of the Settlement Amount to the SEC. The Complaint makes it clear that Morgan Stanley disgorged

---

2010 WL 3490980, at *8 (D. Conn. Aug. 30, 2010) (dismissing a counterclaim for fraud because defendant failed to plead damages, holding "[f]raud is not actionable unless it causes damage"); *see also Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, No. 11 Civ. 594 (DAB), 2012 WL 2953055, at *4 (S.D.N.Y. July 16, 2012) ("[T]he fraud claim must be dismissed for failure to plead adequately the element of damages.").

[6] Under New York law, the elements of a cause of action for breach of fiduciary duty are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). "The essential elements [of] a breach of fiduciary duty pursuant to Connecticut law are: (1) That a fiduciary duty existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced its own interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; and (4) That the damages were proximately caused by the fiduciary's breach of duty." *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No 3:12CV220 (WWE), 2012 WL 5835392 (D. Conn. Nov. 16, 2012).

16

the Settlement Amount to the SEC because it represented the losses avoided by FrontPoint as a result of Skowron's criminal conduct:

- "Because the Skowron-managed FrontPoint hedge funds sold all of their HGSI stock prior to the announcement, the funds avoided losses totaling approximately $30 million." Compl. ¶ 42.

- "Shortly before the filing of the Amended Complaint, in early April 2011, FrontPoint and Morgan Stanley reached a settlement agreement with the SEC regarding its charges relating to Skowron and his HGSI insider trading activities." *Id.* ¶ 84.

- "[T]he FrontPoint hedge funds, without admitting wrongdoing, agreed to pay the SEC" the Settlement Amount. *Id.* ¶ 86.

The SEC Complaint leaves no doubt that the Settlement Amount represented "illegally-obtained funds" as to which Morgan Stanley had "no legitimate claim":

- "By virtue of having sold all of their holdings (or approximately 6 million shares) of HGSI common stock by the close of the prior day, the FrontPoint Healthcare Funds avoided at least $30 million in losses." SEC Compl. ¶ 79.

- "[T]he Commission respectfully requests that this Court enter a final judgment: . . . (d) ordering the Relief Defendants, as constructive trustees of illegally-obtained funds resulting from Defendants' above-described conduct, to return those funds as to which they have no legitimate claim, with prejudgment interest . . . ." *Id.* at 34.

As Judge Cote found in the Restitution Decision:

Morgan Stanley is not entitled to restitution of the amount it paid to the SEC. The amount of the SEC settlement payment represents the disgorgement of the losses that FrontPoint avoided as a result of Skowron's insider trading. This was not money that FrontPoint was legally entitled to retain. This is true as well for the interest component of the settlement payment, which reflects the time value of the money for the period prior to the settlement payment. It cannot be said, therefore,

17

> that the SEC disgorgement represented any loss of money to which FrontPoint or Morgan Stanley was ultimately entitled by law. Furthermore, reimbursement of this payment through the imposition of restitution would undermine the deterrent value of disgorgement, which is intended to deprive violators of the federal securities laws of the ill-gotten gains.

*Skowron*, 839 F. Supp.2d at 747.

In light of the above, it is clear that Morgan Stanley was not damaged in any legally cognizable manner by payment of the Settlement Amount. In addition, as Judge Cote found, allowing Morgan Stanley to claw back its ill-gotten gains would defeat the purpose behind the disgorgement remedy that the SEC sought and obtained. It is well established in this Circuit that "the primary purpose of disgorgement as a remedy for [a] federal securities laws violation is deterrence, through prevention of unjust enrichment on the part of the violator," and by "depriv[ing] violators of their ill-gotten gains." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996); *SEC v. Manor Nursing Ctrs, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) ("[t]he deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits"); *SEC v. Commonwealth Chemical Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched").

Accordingly, the portion of Morgan Stanley's breach of fiduciary duty claim seeking payment of the Settlement Amount as damages should be dismissed.

## IV

## MORGAN STANLEY HAS FAILED TO ADEQUATELY ALLEGE REASONABLE RELIANCE AND ITS FRAUD CLAIM THEREFORE FAILS AS A MATTER OF LAW

Morgan Stanley's fraud claim should be dismissed because its allegation that its reliance on Skowron's misrepresentations was "reasonable" is directly at odds with the facts set forth in the Complaints.

Reasonable reliance is a necessary element of a fraud claim under New York and Connecticut law. *See, e.g.*, *Ashland, Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (applying New York law); *Aviamax Aviation Ltd. v. Bombadier Aerospace Corp.*, No. 3:08-cv-1958 (CFD), 2010 WL 1882316, at \*6 (D. Conn. May 10, 2010) (Droney, J.) (applying Connecticut law).

Here, the Complaint alleges that "Skowron's deception" of Morgan Stanley was "very effective … for nearly three years," and makes the bald, conclusory statement that Morgan Stanley's reliance on "Skowron's misrepresentations" was "reasonabl[e]". Compl. ¶¶ 64, 122.

According to the Complaint, those misrepresentations were:

> [R]epeatedly claiming that (a) he did not have an improper relationship with Benhamou; (b) he never dealt with Benhamou outside the context of his role as a paid consultant of the Expert Firm; (c) he and Benahmou's Discussions were limited to the basket of drugs available to treat hepatitis C and other liver ailments; (d) he never provided any improper benefit to Benhamou; (e) Benhamou never provided him with material, non-public information about HGSI; and (f) he did not sell HGSI stock in December 2007 and January 2008 based on material, non-public information.

Compl. ¶ 119.

But the Complaint fails to explain why, or how, it was "reasonable" for Morgan Stanley to rely on Skowron's denials of wrongdoing for "nearly three years." Instead, the purported reasonableness of that reliance is presented, via the insertion of one word in the 29 page Complaint, as an unquestionable fact. That is not good enough. It is axiomatic that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts in this Circuit regularly dismiss fraud claims pursuant to Rule 12(b)(6) when the plaintiff has not adequately alleged reasonable reliance. *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (affirming dismissal of fraud claim

under Rule 12(b)(6) where plaintiff's alleged reliance was unreasonable on the face of the complaint); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 740 F. Supp.2d 441, 451 (S.D.N.Y. 2010) (granting motion to dismiss fraud claim where plaintiffs' reliance was "unreasonable as a matter of law"); *Aviamax Aviation Ltd.*, 2010 WL 1882316, at *7 (dismissing fraud claim where plaintiff's alleged reliance was "unreasonable as a matter of law"); *484 Assocs., L.P. v. Moy*, No. 06 Civ. 2290 (PAC), 2007 WL 683999, at *4 (S.D.N.Y. March 5, 2007) ("[p]laintiff's reliance was unjustifiable as a matter of law, and the fraud claim must be dismissed"); *Belin v. Weissler*, No. 97 Civ. 8787 (RWS), 1998 WL 391114, at *5-*6 (S.D.N.Y. July 14, 1998) (fraud claim dismissed where plaintiff's "reliance was neither justified nor reasonable").

As set forth below, Morgan Stanley's allegation of "reasonable" reliance fails as a matter of law because:

1. As a highly sophisticated party, Morgan Stanley had an obligation to protect itself against fraud. In order for its allegations of reasonable reliance, and thus its fraud claim, to survive a motion to dismiss, it must allege how, and to what extent, it investigated and attempted to verify Skowron's denials of wrongdoing.

2. At the time the SEC investigation began in February 2008, without conducting any investigation of its own, Morgan Stanley was already aware of facts raising a strong possibility that Skowron was lying, and which would have put a sophisticated party on notice that: (i) reliance on Skowron's statements alone was objectively unreasonable; and (ii) further investigation was required.

3. The Complaints demonstrate that even a minimally diligent investigation would have given Morgan Stanley ready access to the information necessary to determine that no

20

reasonable party, much less one of the world's largest financial institutions, could rely on Skowron's insistence that he had not violated the law.

First, Morgan Stanley's sophistication is beyond question. It is "a global financial services firm that provides, through its subsidiaries and affiliates, products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals." Compl. ¶ 4.

Given its sophistication, Morgan Stanley bore an increased burden to protect itself against fraud, and the law requires this Court to evaluate its alleged reliance on Skowron accordingly. *See, e.g.*, *Emergent Cap. Invest. Mgmt., LLC*, 343 F.3d at 196; *Terra Sec. ASA Konkursbo*, 740 F. Supp.2d at 451 (sophisticated plaintiffs failed to plead facts consistent with their "duty to conduct an independent appraisal" of allegedly fraudulent statements); *Belin*, 1998 WL 391114, at *6 (plaintiff, a "sophisticated investor . . . had an obligation to . . . secure and review" information necessary to verify allegedly fraudulent statements).

Second, in light of the facts confronting Morgan Stanley at the outset of the SEC's investigation in February 2008, it is clear that one of the world's largest securities firms could not reasonably rely on Skowron's denials alone. "When a party is aware of circumstances that indicate certain representations may be false, that party cannot reasonably rely on those misrepresentations, but must make additional inquiry to determine their accuracy." *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994); *Terra Sec. ASA Konkursbo*, 740 F. Supp.2d at 451 (alleged misrepresentations, "when viewed . . . by a sophisticated appraiser, should have resulted in a dissonant picture that looked decisively like a red flag").

The Complaints show that the "red flags" here were legion. They included: (i) highly suspicious facts regarding the timing of FrontPoint's sales of HGSI stock; (ii) evidence that

21

Benhamou possessed the market moving non-public information before the Announcement; (iii) facts suggesting that Skowron and Benhamou had a personal relationship; and (iv) Skowron's undeniable pecuniary incentive to avoid losses in the FrontPoint funds. *See supra* pp. 4-8.

**The Suspicious Timing of FrontPoint's Purchases and Sales of HGSI's Stock:** The manner in which Skowron directed the sale of FrontPoint's HGSI position was an enormous "red flag" in and of itself. The Complaints show that Skowron made a hurried, aggressive effort to sell FrontPoint's HGSI stock less than two months before the Announcement, for what would have been, in the absence of FrontPoint's illegally obtained avoided loss, a minimal return.

In the wake of the dramatic drop in HGSI's share price on January 23, 2008, Skowron's effort to unload the HGSI stock before that date should have alerted Morgan Stanley that there was a strong likelihood that Skowron caused FrontPoint to sell out of its HGSI position based on illegally obtained inside information. *See supra* pp. 4-8.

**Skowron's Relationship with Benhamou:** From the outset of the SEC investigation in February 2008, Morgan Stanley knew Skowron had a relationship with Benhamou, who was privy to the results of the Albuferon trial before they were announced to the public on January 23, 2008:

- FrontPoint had hired an "expert network" firm, "so that Skowron and others could consult with the Firm's medical experts, including Benhamou." Compl. ¶ 21.
- "Benhamou was . . . a clinical investigative physician for" HGSI. *Id.* ¶ 18.
- Benhamou was: (i) "involved in the clinical trials for" Albuferon; (ii) "a member of the Steering Committee" for those trials; and (iii) was therefore "privy to significant confidential information regarding the progress and status of the Albuferon clinical trials." *Id.* ¶ 19.

22

  
- Skowron and Benhamou were close enough that when counsel for FrontPoint and Morgan Stanley wanted to interview him in connection with the recently initiated SEC investigation, Skowron – not the expert network's staff – "connected Benhamou and counsel for FrontPoint and Morgan Stanley on conference call that lasted more than twenty minutes." Compl. ¶ 55.

**Skowron's Motive:** Morgan Stanley knew from the beginning that Skowron had a powerful incentive to avoid any significant losses in the FrontPoint portfolio, since: (i) "[a] significant portion of Skowron's annual compensation was dependent upon the performance of the funds he co-managed," and (ii) "[g]iven the structure of his compensation, Skowron had a significant financial interest in maximizing the performance and minimizing the losses of the funds he co-managed." Compl. ¶¶ 15, 17.

Third, alerted by the suspicious trading history, Skowron's relationship with someone in possession of the relevant inside information and Skowron's motive, Morgan Stanley had a duty to investigate whether Skowron's denials of wrongdoing were actually true. Morgan Stanley alleges that it relied upon, *inter alia*, "[t]he representations by Skowron to Morgan Stanley . . . that . . . (e) Benhamou never provided him with material, non-public information; and (f) he did not sell HGSI stock in December 2007 and January 2008 based on material, non-public information." Compl. ¶ 119. At a minimum, the facts set forth above, all of which were known to Morgan Stanley at the outset of the SEC's investigation in February 2008, should have alerted any sophisticated party that those representations were likely not true.

"[W]here parties have access to information that could expose a misrepresentation, courts will not find their reliance sufficiently justifiable to merit legal protection." *Giannacopoulos v. Credit Suisse*, 37 F. Supp.2d 626, 633 (S.D.N.Y. 1999); *Terra Sec. ASA Konkursbo*, 740 F.

23

Supp.2d at 449 (reliance not reasonable if "information necessary to unmask the alleged fraud [was] accessible to the sophisticated party through minimal diligence"); *Belin*, 1998 WL 391114, at *6 (no reasonable reliance where plaintiff had access to information necessary to confirm truth or falsity of alleged misrepresentations).

**Any Investigation Would Have Revealed Morgan Stanley's Reliance to Be Unreasonable:**
Morgan Stanley claims to have spent over $3 million on a three year investigation. Compl. ¶¶ 77, 95. Despite that fact, the Complaint offers no explanation of why that investigation did not very quickly uncover the numerous emails, instant message records, phone call records, expense reports, and other evidence that would have led anyone to question Skowron's claimed innocence, all of which are contained in the Complaints, and were in Morgan Stanley's possession in February 2008. *See supra* 4-8.

In light of these facts, all of which were readily available to Morgan Stanley before it relied on Skowron's representations, it is clear that Morgan Stanley's allegation of reasonable reliance, and thus its fraud claim, fails as a matter of law and should be dismissed.

## CONCLUSION

For the foregoing reasons, Skowron respectfully requests that the Court grant the Motion in its entirety.

Dated: New York, New York
May 3, 2013

SORINRAND LLP

By:   /s/ Joshua H. Epstein
      Joshua H. Epstein
      515 Madison Avenue, 13th Floor
      New York, New York 10022
      P: 212-600-2085
      F: 212-588-1710

*Attorneys for Defendant*
*Joseph F. Skowron III*

24